IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:05-CV-01193-GK |
| | ) | |
| Volkswagen of America, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO ENTER CONSENT DECREE

Plaintiff, the United States of America, hereby moves this Court to approve, sign and enter as a final judgment the Consent Decree which was lodged with this Court on June 15, 2005, and in support thereof states as follows.

1.     The proposed decree resolves the United States' claims for civil penalties and injunctive relief under the Clean Air Act, 42 U.S.C. § 7401 et seq. (the "Act"), against defendant Volkswagen of America, Inc. ("VWoA") for failing to promptly file a defect information report with EPA disclosing an emission-related defect in approximately 326,000 1999 - 2001 model year Golf, Jetta, and New Beetle light-duty vehicles sold in the United States (the "Subject Vehicles"). Such a report is required by 40 C.F.R. § 85.1903, which implements Section 208(a) of the Act, 42 U.S.C. § 7542(a).

2.     Under the terms of the proposed settlement, VWoA will pay a $1.1 million civil penalty to the United States, and improve its emission defect investigation and reporting system. VWoA already completed a voluntary recall to correct the defect pursuant to an informal agreement between VWoA and EPA at a cost of nearly $26 million.

3.     Pursuant to 28 C.F.R. § 50.7, notice of the Consent Decree was published in the

Federal Register on July 14, 2005, 70 Fed. Reg. 40734-35. The United States received one set of comments on the proposed decree from Kevin L. Fast, Esq., on behalf of Afton Chemical Corporation. A copy of the comments are attached to the Memorandum of Points and Authorities supporting this motion.

4.    The comments did not disclose facts or considerations indicating that the decree is inappropriate, improper, or inadequate. The comments have not altered the United States' determination that the decree is fair, reasonable, consistent with the statutory scheme of Title II of the Clean Air Act, 42 U.S.C. §§ 7521, *et. seq.*, and in the public interest. Accordingly, the United States respectfully requests that this Court approve the Consent Decree and enter it as a final judgment.

5.    The undersigned counsel for the United States has contacted counsel for VWoA who has stated that VWoA concurs with this motion and agrees to the entry of the Consent Decree.

6.    The execution copy of the consent decree, containing the original signatures of the parties, was attached to the Notice of Lodging which was filed with the Court on June 15, 2005. A photocopy of the consent decree is attached to this motion for reference. A Memorandum of Points and Authorities in Support of Motion to Enter Consent Decree accompanies this motion.

Dated: November 4, 2005

Respectfully submitted,

KELLY A. JOHNSON, D.C. Bar # 431714
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
10th & Pennsylvania Avenue, N.W.
Washington, D.C. 20530

/s/ _____
JEREL L. ELLINGTON, Colorado Bar # 9696
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
999 18th Street, Suite 945NT
Denver, CO 80202
Telephone: (303) 312-7321


KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney for the District of Columbia


KEITH V. MORGAN, D.C. Bar #422665
Assistant U. S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 514-7566


OF COUNSEL :

ANGELA E. FITZGERALD
D.C. Bar # 413290
Attorney, Air Enforcement Division
Office of Regulatory Enforcement
Office of Enforcement and Compliance Division
1200 Pennsylvania Avenue, N.W.
Mailcode 2242A
Washington, D.C. 20004
Telephone: (202) 564-1018

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:05-CV-01193-GK |
| | ) | |
| Volkswagen of America, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO ENTER CONSENT DECREE**

**INTRODUCTION**

The United States has moved for entry of the Consent Decree with defendant Volkswagen of America, Inc. ("VWoA"), lodged with the Court on June 15, 2005. The proposed decree resolves the United States' claims for civil penalties and injunctive relief under the Clean Air Act, 42 U.S.C. §§ 7401 - 7671q (the "Act"), against VWoA for failing to promptly file a defect information report with the U.S. Environmental Protection Agency ("EPA") disclosing an emission-related defect in approximately 326,000 1999 - 2001 model year ("MY") Golf, Jetta, and New Beetle light-duty vehicles sold in the United States (the "Subject Vehicles"). Such a report is required by 40 C.F.R. § 85.1903, which implements Section 208(a) of the Act, 42 U.S.C. § 7542(a).

Under the terms of the proposed settlement, VWoA will pay a $1.1 million civil penalty to the United States and improve its emission defect investigation and reporting system. VWoA already completed a voluntary recall to correct the defect pursuant to an informal agreement between VWoA and EPA. For the reasons set forth below, the proposed decree is fair,

reasonable and consistent with the statutory scheme of Title II of the Clean Air Act, 42 U.S.C.

§§ 7521 - 7589, and in the public interest.  Accordingly, the United States respectfully requests

that this Court approve and enter the Consent Decree.

## BACKGROUND

### A.    EMISSION DEFECT INVESTIGATION AND REPORTING

Title II of the Act addresses emissions from "mobile sources," including motor vehicle

emission and fuel standards which are covered by Part A at 42 U.S.C. § 7521 et seq.  New motor

vehicles or motor vehicle engines cannot lawfully be sold in the United States unless a "certificate

of conformity" has been issued by EPA and is in effect for the vehicle or engine.  See Section

203(a) of the Act, 42 U.S.C. § 7522(a).  To obtain a certificate of conformity EPA requires that a

manufacturer[1] test a prototype of the vehicle or engine to determine if the new motor vehicle or

engine meets the applicable emissions standards.  See Section 206(a) of the Act, 42 U.S.C. §

7525(a).  Section 202 of the Act, 42 U.S.C. § 7521, sets forth the emissions standards applicable

to specified classes of motor vehicles.  For light-duty vehicles after MY 1993, emissions of non-

methane hydrocarbons (NMHC) are not to exceed 0.25 grams per mile and carbon monoxide

(CO) emissions are not to exceed 3.4 grams per mile.  42 U.S.C. § 7521(g)(1).

---

[1] A "manufacturer" is:

> any person engaged in the manufacturing or assembling of new motor vehicles,
> new motor vehicle engines . . . or importing such vehicles or engines for resale, or
> who acts for and is under the control of any such person in connection with the
> distribution of new motor vehicles, new motor vehicle engines . . . but shall not
> include any dealer with respect to new motor vehicles, new motor vehicle engines .
> . . received by him in commerce.

Section 216(1) of the Act, 42 U.S.C. § 7550(1).

- 2 -

Manufacturers have continuing obligations after obtaining a certificate of conformity. Manufacturers are required to warrant to the ultimate purchaser that new motor vehicles and engines are: (i) designed, built, and equipped to conform to the applicable emission standards at the time of sale, and (ii) free from defects that would cause the motor vehicle/engine to fail to conform to such standards during its "useful life."[2] Section 207(a)(1) of the Act, 42 U.S.C. § 7541(a)(1). If at any time during the warranty period the motor vehicle/engine fails to meet the emissions performance warranty under Section 207(b), involving state inspection and maintenance programs, the manufacturer is required to repair it at the cost of the manufacturer. Section 207(h) of the Act, 42 U.S.C. § 7541(h). In addition, the Act provides for a recall remedy. If EPA determines that a substantial number of any class or category of motor vehicles or engines do not conform to regulatory requirements, EPA may require a manufacturer to submit a plan for remedying the failure of the vehicles/engines to conform to the applicable standards. See Section § 207(c) of the Act, 42 U.S.C. § 7541(c).

Manufacturers are also required by Section 208(a) of the Act, 42 U.S.C. § 7542(a), to "establish and maintain records, perform tests where such testing is not otherwise reasonably available under this part and part C of this subchapter (including fees for testing), make reports and provide information the Administrator may reasonably require to determine whether the manufacturer . . . has acted or is acting in compliance with this part and part C of this subchapter and regulations thereunder. . . ." 42 U.S.C. § 7542(a). EPA promulgated regulations implementing Section 208(a) of the Act which are codified at 40 C.F.R. §§ 85.1901 - 1909. In particular, a manufacturer is required to file a defect information report, commonly known as an

---

[2] Defined by Section 202(d) of the Act, 42 U.S.C. § 7521(d).

"emission defect information report" or "EDIR," with EPA within 15 business days after a manufacturer determines:  (i) in accordance with the procedures established by the manufacturer to identify safety related defects pursuant to the National Traffic and Motor Vehicle Safety Act that a specific emission-related defect exists; and (ii) that the specific emissions-related defect exists in twenty-five or more vehicles of the same model year.  See 40 C.F.R. § 85.1903.  The manufacturer's duty to report emissions-related defects to EPA is thus closely tied to the manufacturer's duty to investigate defects under the National Traffic and Motor Vehicle Safety Act.

Pursuant to the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), a manufacturer is required to notify the Secretary of Transportation if the manufacturer: "(1) learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard prescribed under this chapter."  The National Highway Transportation Safety Administration's implementing regulations further provide:

(a)  Each manufacturer shall furnish a report to the NHTSA for each defect in his vehicles or in his items of original or replacement equipment that he or the Administrator determines to be related to motor vehicle safety, and for each noncompliance with a motor vehicle safety standard in such vehicles or items of equipment which either he or the Administrator determines to exist.

(b)  Each report shall be submitted not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist. . . . [I]nformation required by paragraph (c) of this section that is not available within the five-day period shall be submitted as it becomes available. . . .

(c)  Each manufacturer shall include in each report the information specified below.
. . . .
(8)(i) A description of the manufacturer's program for remedying the defect or noncompliance. . . .

- 4 -

49 C.F.R. § 573.6.

The "good faith" component of the notification requirement allows the manufacturer to determine if a defect has occurred through several sources. These sources include, but are not limited to: in-house studies, information supplied by purchasers and dealers, or the Secretary of Transportation's finding that the equipment contains a defect. United States v. General Motors Corp., 518 F.2d 420, 426 (D.C. Cir. 1975). Thus, "[w]hether a defect exists in a particular case thus turns on the nature of the component involved, the circumstances in which the failures occurred, and the number of failures experienced." Id. at 427.

## B.     ALLEGATIONS REGARDING VWOA'S FAILURE TO TIMELY FILE AN EMISSIONS DEFECT REPORT

The United States' Complaint alleges that the Subject Vehicles, as originally manufactured, were equipped with a heated oxygen sensor, Part No. 06A 906 262Q ("$O_2$ sensor"), positioned in front of the catalytic converter. The $O_2$ sensor provides information to the engine control module necessary to control the fuel and air mixture in the engine at precise levels for the engine to run efficiently and to meet applicable NMHC, CO, and other emissions standards. As originally manufactured, the electrical system of the Subject Vehicles was programmed to rapidly heat the $O_2$ sensor upon engine start-up. During the winter of 1999-2000, VWoA received numerous warranty claims regarding problems associated with cracked or failing $O_2$ sensors, such as dashboard "check engine" lights being illuminated or reduction in fuel efficiency. The Subject Vehicles contain an "emissions-related defect" as defined by 40 C.F.R. § 85.1902(b) related to the cracking or failure of $O_2$ sensors, Part No. 06A 906 262Q, in the

- 5 -

Subject Vehicles. The cracking and failure of the $O_2$ sensors caused the Subject Vehicles to exceed the applicable emission standards for NMHC and CO.

The United States' Complaint further alleges that on May 1, 2001, EPA conducted a random surveillance test of a MY 1999 New Beetle at its National Vehicle and Fuel Emissions Laboratory in Ann Arbor, Michigan. As is EPA's standard practice, EPA advised the manufacturer of the test, and allowed VWoA to observe it. The vehicle that was tested failed the test, emitting excessive amounts of NMHCs (by approximately 27 times the applicable standard) and CO (by approximately 2.5 times the applicable standard). VWoA filed an EDIR with EPA on June 15, 2001. The United States' Complaint alleges, however, that by no later than May 2000, VWoA determined, or in good faith should have determined, the existence of the emissions-related defect based upon data VWoA received under its established procedures, or procedures established in good faith, to identify safety-related defects pursuant to 49 U.S.C. § 30118(c).

In the intervening period between May 2000 and June 15, 2001, the United States' Complaint alleges, VWoA had worked on a solution to the cracking and failure of the $O_2$ sensors. By April 2001, VWoA had developed a field fix that involved the reprogramming of the Subject Vehicles' on-board computer to slow the rate of heating the $O_2$ sensors upon engine start-up. Around the same time VWoA implemented the same change in on-going production of new vehicles with the 2.0L engine. Through June 2001, VWoA had replaced more than 32,600 $O_2$ sensors in the Subject Vehicles. Shortly after filing an EDIR with EPA, VWoA agreed with EPA to voluntarily implement a recall of the Subject Vehicles. The recall officially began in January 2002 when VWoA issued a press advisory. Ultimately VWoA repaired 277,927 of the subject

vehicles (86.3% of the recall population), by reprogramming the on-board computers, inspecting the $O_2$ sensors to determine if they had cracked, and replacing $O_2$ sensors which had cracked or which a dealer decided to replace.  89,379 of the subject vehicles were fitted with new $O_2$ sensors, amounting to 27.1% of the recall population.  VWoA also notified owners of their right to be reimbursed if they had paid for repairs, and VWOA reimbursed those consumers.  VWoA spent a total of $25.8 million on the recall as of August, 2004.  EPA considers VWoA's recall to have been highly successful.

**C.    SUMMARY OF PROPOSED SETTLEMENT TERMS**

To resolve the claims described above, the proposed consent decree provides that VWoA will pay a civil penalty in the amount of $1.1 million.  Consent Decree ¶ 15.  VWoA will also enhance its system for monitoring, investigating, and reporting emission-related defects to EPA while at the same time continue to comply with EPA's current regulations.  Consent Decree § IV and App. B.  As set forth in Appendix B to the Consent Decree, VWoA is required to commence an investigation to determine if an emission-related defect exists within a given class or category of vehicles or engine family whenever VWoA has reason to believe that the number of vehicles that may have the emission-related defect meets certain thresholds dependent upon the type of component and vehicle fleet size.  VWoA is required to include warranty claims data in determining whether these thresholds are met. The investigation is to be  prompt, thorough, and consider all relevant information available or reasonably obtainable, follow scientific and engineering principles, and be designed to obtain the information which VWoA is required to investigate or report.  ¶ 1.c of Appendix B to the Consent Decree.  Then VWoA is required to file an EDIR with EPA if, based upon the required investigation, specific reporting triggers are met.

For example, if the emission related component is a catalytic converter, engine control module, or other after-treatment device, and the total number of vehicles within the class, category, or engine family is 2,500 or less, VWoA is required to file a defect report as soon as 25 or more vehicles or engines are found to have the defect. As the fleet size increases or other less environmentally critical components are at issue, the reporting thresholds increase at levels EPA's considers to be meaningful and useful. Such requirements are consistent with EPA's latest regulations applicable to certain recreational and "nonroad" vehicles.[3]

It is important to note that the consent decree's specific requirements by which VWOA will be required to commence an investigation whether a emission related defect exists, as well the report the existence of the emission related defect at statistically significant thresholds, is in addition to the existing generic requirements that VWoA may in good faith use to discover safety related defects and then report whenever a defect is determined to exist in 25 or more vehicles. In addition, Paragraph 2(d) of Appendix B to the Consent Decree provides that VWoA will continue to report at current applicable regulatory thresholds:

---

[3] See 67 Fed. Reg. 68242 (Nov. 8, 2002). The rules pertaining to such "off-road" vehicles are codified at 40 C.F.R. Part 1068. Under those regulations a manufacturer is required to track certain relevant information, such as warranty claims and replacement parts shipment, and presume a defect may exist in a vehicle if a warranty claim is filed or replacement parts are shipped for reasons other than normally scheduled maintenance. Using such information, a manufacturer is required to conduct an investigation to determine if an emission related component in engines with rated power under 560 kW is defective at the following thresholds: (a) if the component is a catalytic converter, the lesser of 2,000 vehicles or 2% of the vehicles within the potentially affected engine family; or (b) if the component is not a catalytic converter, the lesser of 4,000 vehicles or 4% of the vehicles within the potentially affected engine family. The manufacturer must then file an EDIR when the following thresholds of vehicles in the engine family having the defect exceed the following thresholds: (a) if the component is a catalytic converter, the lesser of 125 vehicles or 0.125% of the vehicles within an engine family; or (2) if the component is not a catalytic converter, the lesser of 250 vehicles or .250% of the vehicles within an engine family. 40 C.F.R. § 1068.501(e) & (f).

Notwithstanding the above, VWoA shall not be exempt from compliance with 40 C.F.R. § 85.1903, or any regulation amending or replacing it. Until such time that 40 CFR [§] 85.1903 is amended or replaced, VWoA shall in accordance with 40 C.F.R. § 85.1903 file an EDIR with EPA whenever VWoA determines that a specific Emission-related Defect exists in twenty-five or more vehicles or engines of the same model year.

VWoA is required to submit various reports to EPA regarding all its activities required by the consent decree, including a disclosure of any investigations the company has undertaken of potential emissions related defects. See Consent Decree ¶¶ 8 - 10. But VWoA is not therefore excused from any other reporting obligations. Consent Decree ¶ 11.

The proposed consent decree will be in effect for five years from the date it is approved and entered by the Court. Consent Decree ¶ 49.

## D.    NOTICE OF THE PROPOSED SETTLEMENT AND COMMENTS RECEIVED

The Department of Justice published a Notice of Lodging of Proposed Consent Decree and invitation for comments in the Federal Register on July 14, 2005, 70 Fed. Reg. 40734-35. The Department of Justice received one comment letter on the proposed decree from Kevin L. Fast, Esq., on behalf of Afton Chemical Corporation ("Afton"), dated August 12, 2005 (a copy is attached as Exhibit A). The government was concerned that Mr. Fast or his client may have been mistakenly provided, during the public comment period, a copy of the proposed decree that contained a earlier version of one paragraph of Appendix B to the decree. Counsel for the United States wrote Mr. Fast and brought this to his attention, and inquired whether this correction affected Afton's comments. See Exhibit B. Mr. Fast responded by letter dated September 16, 2005 (copy attached as Exhibit C), stating that the correction did not alter Afton's view, and Afton took the opportunity to comment further on the proposed decree. Both sets of comments will be summarized, and responded to below.

## ARGUMENT

**A.    THE COURT SHOULD ENTER THE PROPOSED DECREE AS IT IS A FAIR AND REASONABLE SETTLEMENT CONSISTENT WITH THE PUBLIC INTEREST.**

The standard to be applied by a court reviewing a proposed consent decree is whether the settlement is "fair, adequate, reasonable, and appropriate under the particular facts and that there has been valid consent by the concerned parties."   Environmental Defense v. Leavitt, 329 F. Supp. 2d 55, 70 (D.D.C. 2004) (quoting Citizens for a Better Environment v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983); and United States v. District of Columbia, 933 F. Supp. 42, 46-47 (D.D.C. 1996)).  In general, a reviewing court should be satisfied that a proposed settlement fairly and reasonably resolves a controversy in a manner consistent with the public interest. Environmental Defense, 718 F. Supp. 2d at 70 (citation omitted).  By these criteria, the proposed consent decree should be approved.  Furthermore, this Court has recognized that the policy of favoring settlements "has particular force where . . . a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement."  Id. (quoting United States v. Cannons Engineering Corp., 899 F.2d 79, 84 (1st Cir. 1990)).

### 1.    The Consent Decree Is Procedurally and Substantively Fair.

Whether a proposed decree is "fair" invokes notions of procedural fairness and substantive fairness.  Factors to be considered in reviewing procedural fairness include the "good faith" efforts of the parties to resolve a dispute, "the opinions of counsel, and the possible risks involved in litigation if the settlement is not approved."  Environmental Defense v. Leavitt, 329 F. Supp. 2d at 70 (quoting United States v. District of Columbia, 933 F. Supp. at 48).  See also, e.g., United

States v. Hooker Chem. & Plastics Corp., 607 F. Supp. 1052, 1057 (W.D.N.Y.), aff'd, 776 F.2d

410 (2d Cir. 1985).  Substantive fairness involves "concepts of corrective justice and

accountability."  Id.

Following the random surveillance test of a MY 1999 New Beetle in May 2001 by EPA's

Certification and Compliance Division ("CCD"), which showed that the vehicle was emitting

excessive amounts of NMHCs and CO, EPA and VWoA met to discuss the results of the test and

VWoA's proposed response.  In June 2001, VWoA submitted an EDIR for a malfunctioning O2

sensor in the affected classes of vehicles, and proposed a voluntary recall effort with EPA.  EPA

tracked the recall effort, and determined the recall was effective so that no further recall is

necessary.   The remaining issues concerned ensuring that VWoA would in the future timely

investigate and report emission-related defects to EPA, and an appropriate penalty for VWoA's

delay in reporting to EPA.

Numerous negotiation sessions took place between counsel and client representatives for

both the Department of Justice, EPA, and VWoA, culminating in the proposed decree.  The

parties negotiated in good faith, and at arms-length.  The settlement also holds VWoA

accountable for its failure to timely notify EPA of an emissions related defect in the subject

vehicles by paying a substantial civil penalty.  Because VWoA cooperated with EPA to correct

the defect in the subject vehicles, the Consent Decree focuses on improving VWoA's emissions

defect investigation and reporting system, as will be further described below, to ensure prompt

reporting of emissions related defects in the future.  Timely and accurate self-reporting of

emissions related defects is a critical component of the Title II of the Act.  See Section 208(a) of

the Act, 42 U.S.C. § 7542(a), and EPA's regulations implementing Section 208(a) of the Act

codified at 40 C.F.R. §§ 85.1901 - 1909.  It is simply unacceptable for a manufacturer to delay

reporting an emission related defect until after EPA discovers it by a random surveillance test.

 For these reasons, the Consent Decree is both procedurally and substantively fair.

 **2.** **The Consent Decree Is Reasonable.**

 The factors for determining the "adequacy, reasonableness, and appropriateness" of a

proposed consent decree "focus on the extent to which the decree is confined to the dispute

between the parties and whether the decree adequately accomplishes its purported goal."

Environmental Defense, 329 F. Supp. 2d at 71.  The reviewing court should determine whether

the proposed decree is "reasonable from and objective point of view" and not "impose its own

judgments as to how it would prosecute and resolve a particular case."  Id., citing United States

v. District of Columbia, 933 F. Supp. at 50.

 The proposed decree is objectively reasonable, addressing the conduct and consequences

of VWoA's delay in filing an EDIR with EPA.  The facts suggest that VWoA had actual

knowledge of the defect because of a high number and increasing trend of warranty claims during

the winter of 1999/2000, and VWoA  should have notified EPA of the defect no later than May

2000.  VWoA worked on a remedial program before reporting that an emission-related defect

existed in the subject vehicles.  While the government does not question that VWoA was

diligently and in good faith working on a fix to the recurring failure of $O_2$ sensors in the subject

vehicles, delaying reporting on this basis is not inconsistent with EPA's (or NHTSA's)

regulations.  EPA's regulations require prompt reporting when a manufacturer determines that a

specific emission-related defect exists in 25 or more vehicles or engines of the same model year,

irrespective whether the manufacturer has determined how to correct the defect.  As quoted in

pertinent part above, NHTSA's regulations specifically contemplate submitting a defect report

with then available information, to be supplemented with such information, including a remedial

program, as it becomes known.  Prompt reporting would have allowed EPA to actively monitor

the situation, including VWoA's progress towards and timeline for implementing a field fix, and

also would have allowed EPA to collect better data as to environmental impacts.

While VWoA cooperated fully with EPA in completing a voluntary recall, and in

reimbursing consumers who may have paid for prior repairs of failed $O_2$ sensors at a cost of nearly

$26 million, VWoA did not timely file an EDIR with EPA.  The government considers this to be a

serious violation of Title II of the Act because of the importance of timely and accurate self-

reporting by manufacturers, and a substantial penalty is necessary to deter future noncompliance.

A $1.1 million civil penalty makes clear that EPA will vigorously enforce a manufacturer's

obligation to timely report emission-related defects.  The penalty is also greater than the amount

of any tangible economic benefit VWoA obtained by delaying the cost of funding a compliant

reporting program within the company sufficient to ensure that all relevant data was obtained,

evaluated and submitted to EPA when required.

In addition to a substantial civil penalty, the proposed decree requires VWoA to improve

its defect information data collection system to include warranty claims, to count all warranty

claims (such as those which EPA contends VWoA failed to consider in this case) towards meeting

the thresholds for commencing a formal defect investigation system, and to file an EDIR with

EPA at defined thresholds which EPA believes appropriate, and consistent with its latest

regulations applicable to certain recreational and "nonroad" vehicles.  In addition, the proposed

consent decree, in Appendix B, also requires VWoA to continue to report in accordance with

EPA's current regulations, including the current applicable regulatory thresholds.  VWoA will also submit annual reports to EPA regarding all its activities required by the consent decree, including a disclosure of any investigations the company has undertaken of potential emissions related defects, for five years while the consent decree is in effect.  These requirements are in addition to, and are not in lieu of, any other reporting requirements VWoA may have under the Act, EPA's regulations, or other law.  Consent Decree ¶ 11.  The proposed decree is objectively adequate, reasonable, and appropriate.

   **3.**    **The Proposed Decree Is In The Public Interest**.

   Congress passed the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  Section 101(a)(1) of the Act, 42 U.S.C. § 7401(b)(1).  In 1990, Congress amended the Act, including the mobile source control provisions of Title II, in recognition of the fact that "[c]ontrols on emissions from mobile sources [i.e., cars, trucks, and other vehicles] will be an important part of the efforts to attain healthy air . . . for a simple reason:  mobile vehicles are the largest source of ozone and carbon monoxide pollution."  S. Rep. No. 101-228 (1989) reprinted in 1990 U.S.C.C.A.N. 3385, 3468.  The proposed decree furthers these Congressional goals and thus serves the public interest.

   The proposed decree requires VWoA to enhance its defect investigation and reporting system to specifically include warranty claims data, and defines specific triggers which EPA has now from experience determined to be particularly informative.  Such requirements do not, however, replace existing regulatory requirements applicable to VWoA.  Paragraph 2(d) of Appendix B of the decree provides that:

Notwithstanding the above, VWoA shall not be exempt from compliance with 40 C.F.R. § 85.1903, or any regulation amending or replacing it. Until such time that 40 CFR [§]85.1903 is amended or replaced, VWoA shall in accordance with 40 C.F.R. § 85.1903 file an EDIR with EPA whenever VWoA determines that a specific Emission-related Defect exists in twenty-five or more vehicles or engines of the same model year.

The proposed consent decree is consistent with and enforces existing law, but also requires VWOA to implement specific measures designed to ensure that its future investigations of potential emission-related defects will include useful warranty and other data, and also be statistically useful and informative to EPA, helping EPA in its mission of protecting and improving the quality of the Nation's air. As such, it is in the public interest.

## B. THE COMMENTS RECEIVED BY THE DEPARTMENT OF JUSTICE DO NOT INDICATE THAT THE PROPOSED DECREE IS INAPPROPRIATE, IMPROPER, OR INADEQUATE.

The only comments the United States received on the proposed consent decree were from Afton. Afton objects to the proposed consent decree on two general grounds. First, Afton asserts that the emission-defect investigation and reporting requirements of the proposed consent decree conflict with existing regulatory requirements. Afton's second general objection is that the consent decree purports to alter existing regulatory requirements without a necessary rule-making proceeding. Afton's comments are, however, in error. The consent decree requires VWoA to investigate and report emission-defects under the current regulatory scheme, and also to enhance its defect investigation and reporting system to monitor and provide additional information to EPA. As will be further explained in response to Afton's specific comments, the proposed consent decree neither conflicts nor purports to change EPA's existing regulations.

Afton, as its comments indicate, manufactures and sells fuel additives and lubricants used in motor vehicles, and monitors manufacturer's emission defect information reports for its own

commercial reasons.  Ex. A at 1 - 2.  As set forth in its initial comments (Appendix A) and

supplemental comments (Appendix C), Afton objects to the settlement on the basis that the

decree, in its view, imposes requirements upon VWoA that conflict with EPA's existing

regulations.  Ex. A at  2 - 4, Ex C at 2-3.  Afton further suggests that the decree purports to alter

existing regulatory requirements which, Afton contends, requires EPA to go through a formal

rule-making proceeding.  Ex. A at 5.   In sum, all Afton's comments can be condensed into the

simple statement:  VWoA should only have to comply with existing regulatory requirements.

The Supreme Court, however, has recognized that:  "[I]n addition to the law which forms

the basis of the claim, the parties' consent animates the legal force of a consent decree. [citations

omitted] . . . Therefore, a federal court is not necessarily barred from entering a consent decree

merely because the decree provides broader relief than the court could have awarded after a trial."

Local Number 93, Int'l Assoc. of  Firefighters, AFL-CIO v. City of Cleveland, 478 U.S. 501,

525-26 (1986) (citation omitted).  The Court held that such broader relief is unenforceable only if

it is contrary to or violates the statutory objectives of the underlying statute.  Id. at 526.  See also

Suter v. Artist M, 503 U.S. 347, 354, n. 6 (1992) ("parties may agree to provisions in a consent

decree which exceed the requirements of federal law"); Sansom Comm. v. Lynn, 735 F.2d 1535,

1538-39 (3d Cir. 1983) ("[c]onsent decrees need not be limited to the relief that a court could

provide on the merits").

The United States negotiated a consent decree with VWoA to assist EPA with its mission

of "attaining healthy air."  The proposed consent decree was crafted so that EPA will be provided

added information, in addition to existing regulatory requirements, which EPA has determined to

are particularly useful to the agency.  Furthermore, requiring "extra" compliance is appropriate to

ensure VWoA will not delay reporting emission related defects to EPA in the future. The requirements of the consent decree are not contrary to and do not violate the objectives of the Act, and do not conflict with EPA's existing regulations.

Afton is incorrect that the tiered numerical thresholds by which VWoA is required to either commence a defect investigation or to report an emission related defect to EPA, as set forth in Appendix B to the consent decree, conflict with the existing regulatory requirement of 40 C.F.R. § 85.1903(a). Ex. A at 2 - 4. What Afton fails to recognize is that the consent decree requires VWoA to report at both the tailored, consensual thresholds specified in Appendix B to the decree, and also under EPA's existing regulation. See ¶ 2(d) of Appendix B to the Consent Decree, quoted supra at 13. In sum, the proposed consent decree at the same time enforces and enhances EPA's existing regulatory program.

As another basis for asserting that the consent decree conflicts with EPA's existing regulation, Afton points to the decree's definition of "Emission-related Defect" which excludes damage caused by improper maintenance or abuse by an owner. Ex. C at 2. Afton correctly notes that there is no such limitation within EPA's applicable regulations. However, there is nothing in the regulatory definition that speaks to damage caused by an owner's abuse or improper maintenance. It is EPA's interpretation of the current regulation that it does not apply to damage caused under such circumstances. EPA has made this interpretation explicit in promulgating defect reporting regulations pertaining to off-road vehicles. See 40 C.F.R. § 1068.501(a)(3) (as amended effective Aug. 30, 2004 by 69 Fed. Reg. 39270 (June 29, 2004)). Furthermore, Section 207(c) of the Act, 42 U.S.C. § 207(c), provides that EPA can order a recall if "the Administrator determines that a substantial number of any class or category of vehicles or

- 17 -

engines, although properly maintained and used, do not conform. . . ."  The defect reporting

requirements are intended to give EPA information necessary to implement the recall authority,

and defects that result from owner abuse or improper maintenance would not meet the "properly

maintained and used" criteria of Section 207(c).  Thus, the proposed consent decree does not

alter EPA's view of a manufacturer's obligation as it currently exists.

Afton also argues that the decree authorizes VWoA to avoid complying with the record-

keeping requirements of EPA's Part 85, Subpart T regulations, and specifically the five-year

record keeping requirement which runs from the date a vehicle or engine is manufactured.  Ex. C

at 2.  In support of its position Afton cites to paragraph 13 of the decree which requires VWoA to

retain all records it generates pursuant to the requirements of the consent decree for a period of

five years from the effective date of the decree.  Ex. C. at 2.  Afton's comment again indicates

that it is again ignoring part of the decree.

> The reporting requirements of this Consent Decree do not relieve VWoA of any
> reporting obligation required by the Act or its implementing regulations, or by any
> other federal, state, or local law, regulation, permit, or other requirement.

Consent Decree ¶ 11.

Finally, Afton argues that there is an apparent inconsistency between the requirements of

the proposed consent decree and EPA's regulations regarding VWoA's obligation as a

"manufacturer" to monitor, investigate, and presumably report emission-related defects.  Ex. A at

4, Ex. C at 2 & 3.  NHTSA's regulations, Afton says, have been changed (including a change in

the definition of the term "manufacturer"[4]) to require a corporation to consider information

---

[4] 49 C.F.R. § 579.4 defines a "manufacturer" as:

> a person manufacturing or assembling motor vehicles or motor vehicle equipment,

known to the corporation's parent, affiliates, and subsidiaries in determining whether a safety-defect exists. Afton argues that this change triggered a parallel change in a manufacturer's obligations under EPA's emission-related defect reporting rules, because those rules reference the procedures the manufacturer has established to identify safety related defects. See Ex. A at 4. Afton appears to be arguing that the consent decree's imposition of certain emission-related defect reporting obligations on "VWoA" means that the decree's obligations are narrower than those imposed by EPA's regulations or, at least, the decree is ambiguous.

For the same reason, Afton also argues that the obligation to report an emission-related defect should be triggered if VWoA, *or its parent, affiliates, or subsidiaries,* made the determination that a defect exists. Afton contends the consent decree, in contrast, limits VWoA's obligation to those situations where "VWoA" itself determines that a defect exists, and thus "unavoidably creates ambiguity." See Ex. C at 2-3.

Afton's concerns are premised on its view that EPA's emission-related defect reporting rules implicitly incorporate the definition of 'manufacturer" adopted by NHTSA for its safety defect rules. The United States believes this is mistaken. Instead, the term "manufacturer" in EPA's regulations should be understood as it is defined in Title II of the Clean Air Act, i.e., a "person that manufactures or assembles, or imports new motor vehicles or engines for resale, or who acts for and is under the control of any such person in connection with the distribution of new motor vehicles, new motor vehicle engines, new nonroad vehicles or new nonroad engines."

---

or importing motor vehicles or motor vehicle equipment for resale. This term includes any parent corporation, any subsidiary or affiliate, and any subsidiary or affiliate of a parent corporation of such a person.

See note 1 supra.  Since VWoA is indisputably a "manufacturer" under the Act, the obligations imposed by the consent decree on "VWoA" are as broad as they would be if the decree were to refer to "the manufacturer" instead of "VWoA."  Thus, any duty VWoA might have to consider information held by, or to act on a defect determination made by, its parent, affiliates, or subsidiaries, is the same regardless of whether the the obligation arises under the Act and EPA's regulations or under the consent decree.  To the extent there is any question or ambiguity regarding the scope of EPA's regulations or the consent decree in this regard, it is a question common to both, and not, as Afton believes, an inconsistency between the requirements of the decree and EPA's regulations regarding VWoA's obligation as a "manufacturer" to monitor, investigate, and presumably report emission-related defects.

## CONCLUSION

The United States has considered the both sets of comments submitted by Mr. Fast on behalf of Afton Chemical Corporation, and has concluded that the comments do not disclose facts or considerations indicating that the decree is inappropriate, improper, or inadequate.  Afton's comments have not altered the United States' determination that the decree is fair, reasonable, consistent with the statutory scheme of Title II of the Clean Air Act, 42 U.S.C. §§ 7521 - 7590, and in the public interest.  Accordingly, the United States respectfully requests that this Court approve the Consent Decree and enter it as a final judgment. For the reasons stated above, the Court should approve and enter the proposed Consent Decree.

Respectfully submitted,

KELLY A. JOHNSON, D.C. Bar # 431714
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
10th & Pennsylvania Avenue, N.W.
Washington, D.C. 20530


/s/
_____
JEREL L. ELLINGTON, Colorado Bar # 9696
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
999 18th Street, Suite 945NT
Denver, CO 80202
Telephone: (303) 312-7321


KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney for the District of Columbia

KEITH V. MORGAN, D.C. Bar #422665
Assistant U. S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 514-7566

OF COUNSEL:

ANGELA E. FITZGERALD
D.C. Bar # 413290
Attorney, Air Enforcement Division
Office of Regulatory Enforcement
Office of Enforcement and Compliance Division
1200 Pennsylvania Avenue, N.W.
Mailcode 2242A
Washington, D.C. 20004
Telephone: (202) 564-1018

- 21 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2005, a true and correct copy of the foregoing **Motion to Enter Consent Decree** and **Memorandum of Points and Authorities in Support of Motion To Enter Consent Decree** was mailed, postage prepaid, to the following:

> Norbert Krause
> Director, Engineering and Environmental Office
> Volkswagen of America, Inc.
> 3800 Hamlin Road
> Auburn Hills, MI 48326

> Kevin M. McDonald, Esq.
> Associate Counsel
> Volkswagen of America, Inc.
> 3800 Hamlin Road
> Auburn Hills, MI 48326

/s/
JEREL L. ELLINGTON, Colorado Bar # 9696
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
999 18th Street, Suite 945NT
Denver, CO 80202
Telephone: (303) 312-7321